and we have clearly shown with respect to each one of those three plaintiffs that they entered into an agreement to arbitrate with AMS. They're also appealing respectfully because the district court didn't cite any of that evidence and frankly, in one category of evidence, explicitly said that they weren't going to consider it. Let me just go through each one of these three plaintiffs. Plaintiff Ballou, he clicked on an agreement, specifically below where it said, place your order, his very first order that he made with respect to AMS. It said, place your order immediately below language stating, by placing your order, you agree to the privacy policy in terms and conditions. Counsel, were all of his purchases by Internet? No. Some were by telephone. So are you alleging that the click on the first purchase controlled all of the subsequent purchases? All of the purchases that he had were on the same terms and conditions that contained the same arbitration clause. So with — and that arbitration clause said, this applies to all of your purchases before you entered this contract and previously. So it covered literally everything that was sent to the American Arbitration Act. Well, tell me, aren't there three different versions of this, a 17, 18, 19 version? There are. Of all these documents? All of them had arbitration clauses, but some of them, the language was more specifically kind of drawn out in each one of them. But all three, and it's undisputed that all these versions had the arbitration clause in it that sent it to the AAA. So, plain and blue, he clicked on it. But true, he did have verification orders. And one of the things with respect to him, he had 18 separate ones where he then, after doing that first click, went to this order verification process where he was told in a recorded conversation that these were all specifically done pursuant to the terms and conditions. Well, that gets to another question. When was the contract formed under your view of the law? Was it before the verification process or after? And if you claim it's after, what do you base it on? Well, it's the same logic as Justice Easterbrook in Hill, Your Honor. There, the idea is that there, as Judge Easterbrook said in that decision, there was a sale. And as long as the terms, and there's a reasonable period of time, here it was 30, in Hill it was 30 days, here it was 30 days. In order to look at the product and examine the terms and conditions, your acceptance after keeping that for 30 days creates the contract. It's an executory contract until that acceptance occurs. But then when that acceptance occurs, you agree to all the terms and conditions. Was there a promise of shipment that took place before the verification process? The, with respect to all these products, there's shipment that's going to be made with respect to all of those. But, and you have to get them. They're not picking them up at AMS. They are actually being provided to people so they have the 30 days with respect to that return policy. And with respect to Plaintiff Ballou and Culver, they actually did that. They actually returned product. Ballou did it numerous times. Culver did it once. But they actually did that showing their assent to this process, which is different than Hill. It's actually better for us than it was in Hill, where they actually showed their assent to do it that way, and then they continued to go on. Second, with respect to Plaintiff Culver, and this is the one where, I mean, it's really quite remarkable for me from a litigator's standpoint. He actually signed AMS's customer account agreement that contained an arbitration clause. But doesn't that one create a, have a fact dispute in it, in the sense that I thought he testified something like he always signs it with his middle initial H, and this didn't have his middle initial. So might not, at least for the pre-May 6th of 2014, might there not be a fact issue that needs to be tried? I'm going to respectfully ask that Your Honor, and maybe I'm looking, asking more here in the back left of the corner of the room, is that you look at Appendix 475, 476, 77, and 78. 475 and 76 is actually the agreement. That has in there the scope and the arbitration clause. He said, I didn't read it, I used a middle initial, and it's true. He used, it was Adobe Sign, which is used by governments. I actually looked it up today. It's Utah, Colorado, lots of governments use this. But if you look at 477 and 78 of our appendix, you will see that Adobe Sign provides this very interesting service that, frankly, until this case, I didn't know existed. And it actually can tell when any of us are looking at that email. And we're actually examining it. He examined that, not once, not twice, but 17 times, Your Honor, before he did the Adobe Sign, 17 times, if you look at Appendix 477 and 478. So we come back to Your Honor's question on the, go ahead, sir. When you say he examined the email, are you saying that it's the email that contained the terms and conditions, including the arbitration clause? Correct. It actually contained that customer account agreement that he signed. And if you look at 477, it says email viewed by William Culver at his email address. And if you read that 477, 78, 17 times. And so we come back to kind of what I respectfully believe the genesis of your question is, can I come in as a plaintiff and say, I didn't read it. That doesn't really look like my signature. That gets right back to this court's numerous decisions saying that self-serving affidavits without evidence does not create a genuine issue of material fact. For example, if I just come in and go down below and say to Wells Fargo, I didn't read that mortgage, I don't recognize my signature, that doesn't mean I get it past that summary judgment stage and get to go to a trial. If it does, there's going to be a lot of people in here when we're coming up to this next recession. That just does not work. When we have overwhelming evidence that he has not looked at it and then he Adobe signed it, that is enough. And again, that arbitration clause said it applied to all transactions before and after the effective date of that customer account agreement and send it again to the AAA. Which leads me to Ms. Williamson. She purchased twice, recorded conversations with the same individual, Aaron Rodriguez. He mentioned that all her purchase was subject to the terms and conditions three times in two separate transcripts. And on that, you can look at Appendix 590 and 602. And again, I'm talking to the back left here. But if you look at these transcripts, you will see she was specifically told this. So these are the three plaintiffs in this case who have clearly agreed to arbitration clauses. All this evidence that is provided to you is not cited by the district court. Do you think, you didn't mention Limmer at all in your first brief. I know you do in your reply brief. Yes. Does Limmer have a different test than other States on this period? I respectfully, I don't believe so. I, and you tell from the Limmer opinion. I would be lying if I said that I could, Your Honor. Yeah, it is a difficult decision to read. And I understand what Your Honor is kind of driving at. But with respect to this, and kind of going on foster, which again, and the Limmer's by the Supreme Court of Minnesota, right? Yes. Okay, good. So tell me how it helps or hurts you. No, I think that at it, the Minnesota follows. I don't think it helps or hurts, Your Honor. And Frank, I don't want to be lawyerish to you. What I'm saying is that with respect to the restatement of contracts, there was a cent. And here, with respect to all three plaintiffs, he clicked. That is clearly a click wrap agreement where you just click on, I agree to this order. That's Ballou. Culver signed. Williamson said yes. Offer acceptance, one, two, three, with respect to these plaintiffs. And judges, I'm not even getting, frankly, to the recorded oral confirmations. I'm not getting to the confirming order and shipping emails. I'm not getting to the invoices. I'm not getting to the terms on the website. And again, I've come back to, I'm not coming back to talking about how Ballou and Culver specifically returned their products pursuant to the offer that we provided. I'm just giving you these three things that clearly show, frankly, beyond a shadow of a doubt, that they entered into an arbitration agreement with AMS. What about your bold statement all the time that you don't accept returns? Well, we do accept returns within the 30 days. Why does it say, for any reason? There's bold on several of these. Tell me what that means. No, it doesn't say that. It says, does not accept returns on Boolean item for any reason, period. Can you show me what page? Yeah, it's on the back of these invoices or orders. Can you tell me the appendix number? Well, it's something. It's 119 of 183. District Court document 31-1 has that bold . . . I will take a look at that and be prepared on my reply then, Judge. I just don't have that here in front of me if that's okay. I apologize for that. And I'm sorry that I don't have that, but I have it, but it's in 31-1 and the pages number there are 137, 120, and 93. I will take a look at that. That is in bold. And . . . Well, proceed. And again . . . Yes. That's our website's name. Yeah, that's what I thought. Yeah. Yes. Okay. The only thing I know is the two bolds, they look contradictory. Yeah. And I . . . Proceed. No, you can figure it out. Take care. So . . . Go ahead. Real quickly, with respect to the standing issue then, with respect to the consent order. District Court, what I'm hearing from the appellee is that this is not the Eighth Circuit law. Our contention is that this isn't Supreme Court law. The blue-chip stamps decision specifically says, a well-settled line of authority from the Supreme Court establishes that a consent decree is not enforceable directly or in collateral proceedings by those who are not parties to it, even though they were intended to be benefited by it. Judge Thunheim threw out that issue twice that came up to this Court, and you affirmed it both times with respect to that. There's another, the pure country versus the Sigma Chi fraternity decision said the exact same thing. That's legal error number one that the District Court created. Number two, she said even assuming that there was an agreement to arbitrate, then I'm going to get to the consent decree. If you have an agreement to arbitrate, then that question of arbitrability goes to the arbitrator because we have the triple A that is designated in the High Tech Institute and a number of other Eighth Circuit cases. All that goes to the arbitrator. Then finally, we didn't violate the consent order. The State of Minnesota is not saying it, and there's no, there was no evidence whatsoever that we violated that consent order. To its, to its meat, that consent order says you can have these sorts of terms with consumers provided that you give them notice. I don't know how many different ways we could have possibly found given notice short of going to each one of our customers and perhaps going up to their door with a bullhorn. I mean, we have done this over and over and over again, and that's why I'm asking that this be reversed with directions to order these cases to go to arbitration where they belong. Thank you. I say them at 302. Very well. Thank you, Mr. Maddow. May it please the Court. This is Bruce Steckler on behalf of Appelese, Ballew, Williamson, and Culver. As the Court pointed out, we're dealing not with online transactions, but 120 separate sales transactions with three consumers. And what we need to consider in the context of this, which was not mentioned very much, was the 2016 consent order that AMS entered into with the State of Minnesota, which provided that they couldn't rely on their terms and conditions unless they met certain prerequisites. That was found by the Court not to exist here. What we do see in the factual pattern here are four ways that AMS is utilizing to avoid demonstrating up front the terms and conditions. We've seen an example of a post-purchase, and I think the panel correctly pointed out, we have an offer, we have an acceptance, an agreement to ship. Then we get a post-purchase receipt. In some instances early on, it had the terms and conditions on the back. In later instances, it had a website. Isn't that quite common, though, in modern transactions? I mean, for instance, the purchase of an airline ticket. The terms come later when you get the ticket. Well, Your Honor, and that's exactly what's at issue here is that shrink-wrap agreement. And if you look at the litany of cases that were cited by appellants and even acknowledged by this Court most recently in Foster, there are two things that are required in a situation like that. One is what we would call inquiry notice, where you put on notice about these terms and conditions. And I think if we look in this case, inquiry notice, the courts have found, need to be bold, in caps, underlining, please read this carefully, this agreement involves your rights and obligations. That's one aspect that you need. And then the second aspect that you need to bind somebody to that on a — just like in a ticket or anything like that, is conditional acceptance. Not, no, we're not going to take any refunds, or you can return in 30 days. It needs to say, by agreeing to these terms and — by accepting my product, you're agreeing to be bound to these terms and conditions. Keeping the purchase, you accept terms and conditions. And so if we look at the facts of this case, and I think Judge Benton pointed it out, from 2015 to January 29, 2019, we don't have a valid shrink-wrap agreement on its face, because we don't see any conditional acceptance that's required by the case law in the litany of cases cited in the briefing, nor referenced in, most recently by this Court, in Foster. And then after January 29, 2019, in those next receipts that are at issue, okay, we don't see that requisite inquiry notice, which I think this Court was very careful to point out in the Foster v. Walmart case, that we're looking for mutual assent. We're looking for — to put people on notice. In this instance, the post-29, 2019, it says, notice for all purchases other than bullion and final sales. First of all, that's not inquiry notice, because notice actually is confusing, because it says notice for all purchases other than bullion and final sales. Well, in Minnesota, coins are bullion, so in and of itself it's confusing. And I think this Court and Judge Nelson's analysis perfectly mirrors all of the opinions cited here when you have what I call shrink-wrap, and that is — Well, it's on the — I'm looking at those invoices I was talking about. Yes. It is true, though, if you turn it over, they do try to define bullion items and purchases other than bullion items. Right. But — And it isn't bold. It's confusingly bold, but it is bold. Well, I think, Your Honor, just to actually answer the question, that's exactly what we're not looking for, because the determination by the Eighth Circuit is whether a reasonable and prudent person would know to inquire further, and you have to look for mutual assent. And in looking at those facts — You would turn over the sheet of paper, most people would. It says — and that's pretty big, too, on the latter ones — see reverse for return policy. That — You know what I'm referring to, I bet, yeah. Right. But it doesn't say, this concerns your rights, this is going to bind you, and this is important. As the Court said, and I think Judge Nelson was clear in looking at the case law, AMS's terms and conditions do not splash in front of the facts. Well, counsel, I got to tell you, that printing is as big as the price you're paying, the $418 over here. It may be big in size, but is it truly noticed so that the reasonably and prudent consumer can understand what they're being bound to here? And let me just point out, we are talking now of a sliver of purchases post-January 29th, 2019. But there's no evidence that these additional — they have to meet that shrink-wrap acceptance and that notice and conditional acceptance in order to have a binding agreement. Because in the initial instance, which is what we were talking about earlier, we just — we have the UCC and Minnesota statute applying to offer an acceptance, and these are additional terms. And if they want to meet that based upon those receipts and invoices, they have to have those two elements satisfied. Didn't the district court do sort of a UCC, I think it's 2-207, the old battle of the forms analysis? Actually, the court did not. The appellant referenced the concept of a battle of forms, I believe, Your Honor, in a case in the Seventh Circuit. I believe it might have been Hill is where they had referenced that. But this really isn't a battle of forms at all. That was going to be my question. Do you agree with me that that's not what's going on here? No, not at all. And so I think it's important in analyzing this, and, yeah, there are a number of different ways that we see here. One thing that we note, and you'll notice throughout all of this, is there's not full disclosure of the terms and conditions or the issue in here arbitration. Even so, we have the receipts, which we talked about. Then we have these e-mail confirmations with a hyperlink. Okay? That's not notice, conditional acceptance you have. We have a post-person purchase mention on these phone calls. Oh, by the way, you know, now that our deal is done, all of our terms and conditions can be found on our website. And then the interesting one which was mentioned earlier, which was this Mr. Culver, who — Well, as the district court — Why isn't that your conditional acceptance, so to speak? Sure. Well, we — let me — let me address that directly. First of all, we have — and I believe I'd like the Court concluded on the evidence that this post-purchase process, okay, we had an offer, we had an acceptance, an agreement to ship. So we have under Minnesota law an agreement. If they want — But, again, I come back to this kind of thing happens all the time. You buy a phone and you buy a computer. You know, you've purchased the computer, you go home, you open it up, there's the box, and now you've got all these warranty terms that you had no idea what they were before. And by keeping the computer, you've accepted the terms. No, by clicking on — usually, and this is where the term of click rat came in — by clipping your — clicking your assent that you've read them and you agree to them, you've done that. And in this case, we don't have evidence of receipt of the e-mail, notice of the actual terms and conditions, as the Court found. And it was — Wait, wait, wait. These are all additional terms. Your argument is that they had — they would have had to agree to the additional terms at the time of purchase. Well, there are several scenarios. Let me be clear. They had to, one, if we're going to do it at the time of the purchase, to advise them, we have offer — this is what we're offering. We have terms and conditions. These are our terms and conditions and disclose them fully, a payment and agreement to ship. That's one instance. The second instance, which is what I think the Court is getting to, would be you have your offer acceptance and you're done with your agreement under a UCC analysis of a merchant with goods. And then the next issue is, okay, do you want to add additional terms and conditions? Well, to do that — Well, wait a minute. The terms you need, the inquiry notice and conditional acceptance. Are you really adding terms? I mean, isn't it more of offer, agreement to pay? But it's subject to our conditions, which you can go look at, and you can then return within 30 days after. And you're then put on inquiry notice at the time they tell you there are these additional terms. And — You can either go look at them or not. Your hypothetical would be correct, except the facts of this case are not conditional acceptance, which I think Judge Benton had noticed. There was not that if you don't agree to these, you can return them. That did not exist prior to January 29, 2019. There wasn't conditional acceptance. And that's why the courts have been very careful in noting we're looking for inquiry notice and putting everybody on notice of what the terms and conditions are. Do you think that this falls within the additional terms — I'm quoting from Limmer here — as being proposals for additions to a contract? You know what I'm talking about at the end of — I think it's the end of Limmer. I have it here, but in Limmer for sure. Yeah. How does that apply to this case? That is Minnesota law, right? That would form the basis contract? Yeah, okay, good. Do you want to talk about that for a second? Sure. And I believe that case addresses the Minnesota UCC 2207. And in that instance, you have your — you've agreed — you made an agreement just like in this. Anything else would be additional terms and conditions. And I believe that case is 1980, if I'm correct, somewhere in there. And those are additional terms under the UCC. It's still the law of Minnesota, though, correct? Yes, yes it is. Per se, yeah. And — and those are — and so these are additional terms. And since that time in 1980, if you want to bind someone to additional terms, you would have to follow the elements laid out in, I believe this Court identified, looking for mutual assent in — in Foster and — or in Grandhoe, which was a 2014 case where you had a offer and acceptance, and then they sent terms later. You look, was there mutual assent to that? And — and the case law seems to indicate, one, were they notified of this? Did they agree to it? And was there a conditional acceptance? Those elements don't exist here. So we really do fall under, as you noted, Judgmenten, is that this is UCC 2207. These are additional terms. I know we cited a case out of Texas, a very similar case to the fact pattern here, in which the exact same thing happened. And that Court in the Western District of Texas said these are additional terms citing the same UCC codes that we see here, because they didn't have this sort of conditional 30 days to return, or if you don't return, you accept these new terms which you've been put on notice about. Well, they're invoices or whatever you were calling these things. They're actually receipts. Yeah. Okay. Whichever they are, it doesn't matter. I would beg to differ. Oh, you think — you think they do. It doesn't matter. Okay. I do. I do. They're great. But regardless of what you call them, additional proposals, let's call them that. Yeah. That's the State law term for this, I think. Suppose we call them that, whatever you want to call them. Surely some of these final ones, because they kept changing them, as you and I know, surely some of these final ones were sufficient to have some contract sometime with somebody, aren't they? You know, it's interesting, Your Honor. You would think so, except it comes down to exactly what I pointed out and what you and I had gone through earlier, which was, is this notice to all purchases other than bullion in final sales, that notice in bold and caps that you may see is really not consistent, at least based upon all the case law that I've looked at, that indicate what inquiry notice would be for someone in this situation. Is that going to give your ordinary and prudent purchaser of these coins a notice of — because inquiry notice is very important, rights and obligations, you're binding yourself to this. We don't see that. And when Judge Nelson provided her analysis, and that analysis, I should point out, in this case was done even before the Foster decision came out, she said that she didn't find that mutual assent or enough evidence to show that that would be adequate inquiry notice or that they had agreed to that. And I think that's really the case here. I think what we have is a consistent pattern by the company, as evidenced by the 2016 consent order, to not actually disclose the terms and conditions until you've either locked somebody in. And that's why the State came in and put out these prescriptions, really, of what needs to be done to adequately disclose terms and conditions for this company, of which my clients are consumers. We are exactly the people that this order was designed to protect and designed to prevent from being duped into undisclosed terms and conditions. And let's be clear, this could have been avoided by doing what they should have done up front, which was tell them, as they had agreed to do in a consent order, disclose the terms and conditions up front at the time of the sale. Let everybody know what's involved in the benefit of the bargain. That was not done here. And that is fundamentally the problem, and now we're just trying to Band-Aid and backfill a means to try to bind people to things that were not disclosed. Thank you all. Thank you, Mr. Stoeckler. May it please the Court. Judge Benton, I made you a promise with respect to that, and I did find it. And you already, I think, answered the question, though. This, with respect to bullion purchases, there's no return policy, because that's really, you're almost buying, like, think of it as a bar of gold. Gold fluctuates a lot, goes up and down. So the idea is that when you're buying this, you're taking the risk that it's going to go down, and I'm taking the risk that it's going to go up. With respect to the return policy for collectibles, that's the 30 days. That is exactly what Mr. Ballou and Mr. Culver did, as we described. And Mr. Stoeckler, though, says prior to January of 2019 that there was a no return policy even for the coin. That's false, Your Honor. Appendix 99 and 100, that was just what I brought up. We actually put this chart in our brief showing that Ballou returned on July 2, 2015. Culver returned four different times, from August 9, 2013 through November 7, 2019. Okay. Those are actual returns. But the question is, is it disclosed in the receipts or somewhere that prior to January of 2019 that you have the right to return it if you don't want to accept these terms? It was disclosed to them. That's why they did it. Yes. Yes. And we've got that all over this record. Yes, absolutely. With respect to, Judge Benton, your question regarding Lemmer, I was thinking of about a different Minnesota Supreme Court case on the manifestation of assent, and I'm sorry, I forgot Lemmer was a 2207 decision. 2207 just doesn't, there's no forms here to battle. There's ours. And then the argument then comes, well, geez, this should have been done up front. If I could permit the Court just a quick analogy. I'm from a small town, farm town in southern Minnesota. A lot of people buy John Deere tractors. That's been open since 1837. Let's suppose my family bought a John Deere tractor every year from 1837 all the way up to 2022, but for the first time in 2021, we signed or we agreed to an arbitration clause. That does not mean that we get to go back and sue for all those previous years. We have an arbitration clause now. It's just that, and that arbitration clause in this case applied to all purchases before the effective date of that agreement and all after. And all due respect to counsel, but what more can possibly be done to tell somebody like Ballew, by placing, clicking here, you're agreeing to the terms and conditions with respect to Culver, signing a contract that you looked at 17 times? I mean, that is absurd to come in here and to say that we have not given this sort of notice to people when he's looking at it over and over, when the invoices are there, when the order verification process is there. It's being recorded with respect to these plaintiffs. And 2015, the print was very small, though, June 2, 2015, right? Your Honor. You've seen the affidavit. Listen, I'm 55. I need my glasses, too, with respect to reading all that, but I get it. And with respect to that font size, I understand that with respect, that can be a concern with respect to every case. I'm not going to say otherwise. Thank you. Same thing with respect to every credit card that we have. Every time that we look at terms and conditions on a Wells Fargo or a U.S. bank, I mean, I don't know anybody other than a lawyer that's read it, but they're very small, but they're all still very enforceable, and I'm out of time. Thank you. Okay. Thank you, counsel. We appreciate your briefing and appearance and argument today. The case will be submitted and decided.